Good morning, Your Honors. Monty Cooper for the Appellants and Plaintiffs in the Act in Compassion Over Killing and General Legal Defense Fund and six other individuals. I'd like to reserve, if permitted, four minutes on rebuttal. The matter before the Court this morning arises from the denial by four different regulatory agencies of petitions for rulemaking to compel those agencies, which all have been mandated by Congress in different ways to permit regulation over labeling of the origin sources for egg shells in commerce to the agency. I have a background question. These were petitions to instigate rulemakings. They weren't rulemakings. I'm sorry. This was a petition to instigate rulemaking. They weren't rulemakings. What is the standard in general? I can imagine it cutting both ways. On the one hand, since it isn't a rulemaking, one presumes that you don't have to prove up your case entirely. You just have to say, give them enough to say that this is worth looking into. But on the other hand, the agency has a great deal of discretion as to whether it wants to engage in rulemaking. And why isn't just enough for them to say, which is essentially what the district court held, we just don't want to do rulemaking. I mean, they have other reasons, but they also ultimately said we just don't want to do rulemaking in this area. Now, is that a sufficient answer, and why not? No, Your Honor, it's not. And I'd like to focus particularly on the denial by the Food and Drug Administration to explain why. Simply because the United States Supreme Court has given clarity to the answer to your question. It is certainly true that in Massachusetts, the EPA, the United States Supreme Court, dealt with the precise issue that is before the court this morning. I thought that was a statute that had a shall in it. It is a statute that had a shall in it. But I'd like to start where Massachusetts v. EPA started before you get to the shall and to underscore why that. Regulatory compulsion doesn't dictate the outcome of this case. In Massachusetts v. EPA, first of all, to answer your question, the court acknowledged that denial of rulemaking is entitled to extremely limited and highly deferential review. We are not here to deny that. Unfortunately, the court then proceeded to explain when extremely limited and highly deferential review nonetheless is permitted. In Massachusetts v. EPA, the critical point was the EPA had denied that it had the ability to regulate greenhouse gases as an air pollutant under the Clean Air Act. Essential to the decision was the fact that the Clean Air Act had defined an air pollutant as, and it was emphasized multiple times in the opinion, any, the word any being of critical importance, any air pollution agent or combination of such agents. The reason that issue is so critical for the purpose of understanding how the FDA falls within the ambit of Massachusetts v. EPA is because here the Food and Drug Cosmetic Act defines a label to be misbranded for purposes of the prohibition of introduction into commerce of a misbranded label in any particular. It actually says false or misleading in any particular, the key word being any again. Now the FDA, in denying the rulemaking here and bearing in mind that what was being asked by the petitioners was that the FDA identify the source and production method, whether it was X from caged hens, cage-free hens, or free-range hens, that that information be included on the relevant labels being introduced into commerce. The FDA elected to look to the definition of misleading, that is separately contained in the FDCA, and relates to both affirmative misrepresentations and omitted material misinformation. It then ruled that it was compelled by a 1992 guidance decision that relates actually to genetically engineered farm food items, that relates only to omissions, that using that definition that it could employ a definition of material that would require the petitioners to prove organoleptic nutritional or health consequences of what were being mislabeled, and specifically the FDA denied that it could in fact regulate if it was actually desirable by the public for origin of the food items by virtue of where they were produced. That was a threefold error. I understand. Unfortunately, Massachusetts VEPA, again, gives us a guidance. Because in Massachusetts VEPA, that's exactly what the EPA said as well. They said we don't have the power to regulate greenhouse gases. They noted the ongoing debate about global climate change and the relationship of greenhouse gases to that concern. They then indicated that in the shall language that you were referring to, occurred in a statutory demand that the administrator of the EPA should regulate air pollutants if in his judgment they contributed to air contamination. He, the EPA, said, well, it's our judgment that even if we agreed that greenhouse gases were in fact contributing to the problems of global warming and were in fact a source of damage to the states and the individual petitioners involved in that case, they nonetheless did not want to exercise their discretion to regulate because of concerns of, for instance, separation of powers, how it would impact the President's negotiation with countries like China over global warming. But why isn't the shall dispositive there? I mean, the fact is that that statute said if you're within the definition and you shall regulate. Well, what it said is in judgment. And here, by the way, the statute, the FDCA. But it didn't say the judgment was a judgment as to whether or not it was in standard. The court obviously said, well, this was a, your judgment about that was just not a legitimate judgment. But once it was within the statute, they had to regulate it. And I would say that's the circumstance we have here. Because, first of all, we have to go back to the organic statute. They say, well, we can just do it by individual enforcement. We're not going to issue a reg. Is there anything in the statute that requires them to issue a reg about something that's within their purview? Well, I would argue, Your Honor, that the purpose of the Massachusetts EPA case is to state that if you are misinterpreting your organic statute and then saying in the alternative we would not regulate anyways, you cannot settle on that justification because it suggests that you are not giving a hard look at your obligation under the relevant organic statute giving you the right to regulate in the first place. In fact, that's almost exactly what happened in the Wild Earth case that followed the Massachusetts EPA, and which the government heavily relies upon to argue that what the EPA, or what FDA did here was permissible. But what was critical in Wild Earth, which actually dealt with the exact same regulations as Massachusetts EPA, is how the agency characterized its discretion not to regulate. There they didn't deny that they couldn't regulate air pollutants, and in fact they said they might do so in the future because it arose from a petition to have coal mines regulated under the Air Pollution Act for greenhouse emissions. What they said is we will prioritize the regulations that we have been compelled to actually enact by virtue of their need, and in that case they noted that over 60% of air pollutants from greenhouse gases came from electrical facilities, and that only 15% came from coal mining, and said we have to prioritize the 60 over 15, although we don't deny that we have the ability to regulate. Here the point is that the FDA actually denied it had the ability to regulate. It said that it was limited to organoleptic qualities, when in fact the case law and the statute itself belied that. Let me ask you a question. It seems like in your amended complaint you seek relief in the form of a court order directing each of the agencies to initiate the rulemaking that you have proposed in your petition, but I'm curious what's your precedent for such an order where we would take that sort of extreme relief in light of the agency's broad discretion here? It's the same authority that governs all petition making. I applaud it. I don't have the exact statute in front of me, but it would have been the same one involved in Massachusetts DEPA. What we are asking is that the court reverse the district court because the district court relied on the discretion alone for FDA and FTC that Judge Berzon highlighted, and that in the case of FSIS and AMS denied it on the basis that they didn't even have the ability to regulate under the organic statutes. The remand would be to the agencies to consider the evidence in light of a proper understanding of the statute, and that does permit the regulation to go forward under that. Well, let's break this down a little bit, because it seems like first we review whether or not they provide a reason. That explanation seems like you're challenging that as well. That is true. And if they provided a reason to explanation, I guess then if we get beyond that, then we get to whether, I guess, we direct further rulemaking? I'm trying to understand that. It would be remanded to the agency to consider the petition in light of the proper standard of understanding the organic statute. And if the FTC, you know, and I guess you dispute their conclusion on this, not the FTC, that the images and phrases that appear on the labels like farm fresh and sunny meadow are not inherently deceptive, even if we were to disagree with the FTC in their determination that these phrases aren't inherently deceptive, I guess don't we have to defer to their judgment? They have incredible discretion here, and especially based on their experience and expertise in determining what is deceptive under the FTCA. Well, the FTC, Your Honor, made that decision without any attempt to actually identify what is truthful or misleading about the phrases that they addressed. In fact, our position on that is they didn't give a hard look at all and that they only provided the answer on their discretion after we sued and that they didn't even respond to the petition for rulemaking until then. Having said that, it is still a variation on the error that I am highlighting that is particularly apparent with the FDA that the FTC first stated, we don't believe we've satisfied the bases for our jurisdictional grant of rulemaking in the first instance. But if we agreed with you that we did, we would prefer to go by in force. Let me ask you this. What other evidence besides those four surveys that you submitted, I guess, do you believe demonstrate that the ink labeling practices here are deceptive and prevalent? I can give you an answer. That was only focused on natural, not the others, and it was just the four surveys, and I'm just trying to figure out, was there anything else besides that? Yes, we introduced evidence like, for instance, what's available at ER, the excerpts of record 2547 to 2550, the actual consumer cartons, images of them, with the information showing that. That was kind of anecdotal. It does seem to me that the problem in that case is the prevalence problem, demonstrating how you showed some cartons. Well, Your Honor, we also, as Judge Markian pointed out, did introduce survey evidence. I thought the survey was about what people thought these things meant, but was there surveys about how much of this implicit misrepresentation was going on? They weren't deceptive as the prevalence. That's true, but the FTC never said what standard they were applying as to what would satisfy prevalence. I suppose that's what I'm trying to say. There's no hard look when you can't, not a single one of us in this courtroom today can answer what the FTC was looking for because they failed to state it. They simply said there was no prevalence. Yet the petitions only introduced evidence of misleading. What does the case law suggest as prevalence? The case law suggests that it has to have an impact on commerce, and in fact, because we introduced the poll evidence and we introduced all this evidence from the grocery stores, I believe that we had more than adequately satisfied the prevalence standard. But, again, whether the case law has a particular standard that we could all agree was necessary for the FTC to meet in the first instance, they didn't tell us why we didn't meet it. They simply said we don't believe that this is prevalent. They never actually defined why. Your Honor, I actually have a request to reserve four minutes. I'm actually down to one minute. I would like to reserve the remainder of my argument for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, Jeff Sandberg for the federal agency defendants. The district court correctly concluded that each of the four federal agencies at issue here acted reasonably and within their statutory authorities and deny plaintiffs' rulemaking petitions. As the FDA, first of all, why isn't Mr. Cooper Wright, that reading of the statute should be limited to misbranding that has to do with the characters of food? Is it too limited a reading of the statute? So, in FDA's interpretation, so Mr. Cooper is quite right that the Food, Drug, and Cosmetic Act prohibits labeling that is false or misleading in any particular. The statute then defines misleading in several ways. It's misleading if you make an affirmative misrepresentation. It may also be misleading if you make a representation that's a half-truth or, in limited circumstances, the failure to disclose any information at all might be misleading. But I do disagree that the FDA seems to be saying that whichever it is, it has to be about the character of the food and not about where the heads are living. I do disagree. It's only, as to the last category I mentioned, where no statement is made at all, where FDA believes that in order to mandate that producers speak, speak when they're not otherwise inclined to speak on their carton, it needs to be about the character of the food itself rather than That's the case. But the FDA letter does seem to reiterate and reiterate and reiterate that problem. And that's partly because it never acknowledges that there was a misrepresentation claim here as well. The problem, Your Honor, is that the plaintiff's rulemaking petition didn't say, we want to propose a rule that if you're going to tell half-truths, if you're going to say animal-friendly or all-natural, that you need to speak fully. They were proposing a mandatory disclosure on the entire industry, and it's perfectly sensible for FDA to hold them to the standard of compelled disclosures rather than correcting half-truths. The FDA completely skipped over this whole misrepresentation, didn't even seem to acknowledge it. I mean, there was no specific comment at all on that. And I understand they have wide discretion in this area, but under this act that they're suing under, I mean, you need to provide a reasonable explanation. And I'm just trying to figure out if there was a reasonable explanation with respect to the misleading information that was brought forth in the complaint regarding the head's living conditions. First, Your Honor, you're quite right that the agency's discretion to decline to proceed by rulemaking rather than enforcement is independently sufficient as opposed to this case. And that's what the district court found here. And there's no need to tell them further. That's not what I said. You first have to provide a reasoned explanation. Yes, and there was a reasoned explanation given as to. So show me where the reasoned explanation was addressed regarding the egg labeling practices and the misleading information about the hen's living condition. I mean, because they did highlight, the plaintiffs have the misleading phrases and imagery that frequently appear. And it seems like the FDA did not specifically acknowledge that. Again, it's really important to keep in mind what the proposed rulemaking was here. The agency isn't required to consider other potential rulemakings. It's required to look at the rulemaking before it and give a reasoned explanation in response to that. I guess I would like authority for this if it's true. But if they come to you and say there's this big problem, there's all this misrepresentation going on. And they put a lot of, they have a huge record. And then they say, well, what we would like you to do is to X the agency does have some authority or responsibility to say, yeah, there really is a big problem out there. But we're not going to do X. We're going to do Y. Or we're going to look into X. And we're also going to look into Y. The agency certainly has the authority to say, thank you for calling your attention to this problem. It's a big problem. We don't like the idea that you've come up with. But we think there's a different way of addressing it. We're going to take the ball and run with it in a different direction. The agency absolutely has that power. But it does not have the obligation under the APA to come up with and explain why those are also insufficient. So, again, the rulemaking scheme here is every producer, including those that have no imagery on their egg cartons, that don't say Sunny Meadows or Farm Fresh or All Natural, that they should be compelled to speak about their egg production practices. And that is a higher standard that has to be met under materiality. It needs to be concerning the attributes of the food itself. Another way to look at it is as a remedy for the fact that a lot of people are having these misrepresentations is to require people to, whether they attempt to put truthful information on it. In other words, or put it another way, if the agency did this whole investigation and concluded that this was rampant and it was really a problem, they couldn't issue this regulation with regard to everybody or they would have to limit it to people who also had their little heads running around on the farm. The agency's explanation in the decision letter here is if to mandate speech about the method of production here, it would need to go to the attributes of the food itself. If the plaintiffs had proposed a rule, which they disclaimed doing, but if they had proposed a rule that said, if you speak, you must tell the complete truth. If you say animal friendly, you must say whether they live in cages, FDA would have the authority to issue that regulation because then we would have a problem of saying something misleading in light of such other representations. But again, that's not what the plaintiffs are trying to do here. They're trying to say that every egg carton must have a section on it that talks about the method of production. And FDA is concerned about making sure that the entire label isn't full of mandatory disclosures with everything. There's problems with consumers not paying attention if the entire label is full of mandatory disclosures. And so it has prioritized health and safety disclosures over other disclosures. And that's not to say that FDA couldn't have issued a rule that said, if you say animal friendly, you must say whether it's in a cage or not. But that's not what the plaintiffs proposed here. And it more than complies with the recent decision-making requirement of the APA for the FDA to have made that observation here. But it seems like the FDA only focused on omission and not misrepresentation, at least as I read the complaint. And it causes me some pause that the FDA misconstrued the basis for the plaintiff's petition. And perhaps if it had looked at it, it would have provided or at least conveyed that it had looked at it. It might have provided a stronger basis why it's not pursuing rulemaking or have decided to promulgate plaintiffs' proposed regulations. That's the problem that I'm having. It's just I'm not quite sure. Because the focus was on the omission instead of the representation that the FDA provided a reasonable explanation. But I want you to try to convince me otherwise. I share your confusion, in part because plaintiff's presentation in this court has been- I don't think I'm confused about it. That's the problem, I think, with the response from the FDA. But you tell me if I'm wrong. I'm confused. I'm confused because the plaintiff's presentation in this court has been to talk about affirmative misrepresentations and are saying, why is an FDA doing something about affirmative misrepresentations? The presentation to the agency was that they wanted mandatory disclosures. And if you look at excerpts of Record 22- But at a minimum, the FDA didn't explain that. It didn't say the reason that we're not considering this as a deceptive. I mean, I did not get from reading the FDA's analysis that there was a distinction in its mind as to the need to focus on the actual product between material misrepresentations, between omissions and affirmative misrepresentations. There's nothing in this document that says that. Is there? Well, it's reflected in the statute itself, which is discussed in- The document that says that the reason we're not taking into account affirmative misrepresentations is because of the particular way that this petition was framed and that there is a difference under the statute. Well, the plaintiff's petition that they presented to the agency said, we are complaining about, quote, omission of production practices on egg cartons. Excerpts of Record 22-51. The petition that they presented to the agency was a demand for mandatory disclosures on egg cartons. And they did provide some examples in their petition of things that they thought were misrepresentations. But they said, we want an industry-wide fix to the problem of these bad apples. And it is not an abusive discretion for FDA to take the plaintiffs at their word as to what they are seeking here. There's a distinction in the statute between affirmative misrepresentations and outright omissions. And outright omissions are held to a materiality standard, and affirmative misrepresentations are not. I do want to point out that- My question, which is, is there anything in the FDA document that says that? Yeah, if you look at 82-62 and 82-63 of the excerpts of Record, that's the FDA decision. They walk through the definition of materiality under the statute, and they explain- They don't say it just like you said it right now, do they? I wasn't quoting word-for-word from the decision. I mean, you're looking to the materiality section. Your point is to the materiality section. I have a question about the FTC. Because it seems like plaintiffs did provide at least some evidence of consumer confusion around the word natural. Those were the petitions, but the FTC thought this was inadequate. I'm just curious how much or what type of evidence would be sufficient for the FTC to convince the FTC that consumers are being deceived by the egg-labeling practices. Certainly more would be required than what we have here. The 2007 Zogby Poll, which asked consumers, what do you understand the term natural to mean? There were a range of reactions, and the study itself concluded, quote, respondents are not clear on what the term natural implies. So what the agency would be looking for is what is the net impression that a consumer is taking away from a particular label, not just a term in isolation, but a whole carton. But how would it be presented? A hundred surveys, what data is it that you would look at, or the results of what data would you look at? It's a case-by-case determination. But here you've got a range of different representations that are being made. In some cases it's animal-friendly. In some cases it's farm-fresh. In other cases it's natural or naturally raised. Those things, either in isolation or in combination with cartoon imagery, images of pets, might convey different representations. And we can come up with examples right here that sound very misleading, and we can come up with some where we're like, well, I'm not sure whether that controls. So is it a subjective determination by the FTC? It's an expert judgment on whether the net impression that a consumer is going to take away from a particular label is likely to be misleading. And you also need to know, then, does the consumer think that this means a hen was or wasn't living in a cage? And then you need evidence whether the hen that produced the eggs that were subject to that cartoon did or did not live in a cage. It's sort of not enough to say, well, I think animals were well-treated. I mean, their proposed rulemaking here was about cages and whether a hen lived in a cage or not. And a poll that pertains to livestock and poultry and egg-producing hens that asks whether they ever have access to the outdoors isn't specifically focused on whether the animal resided in a cage or not. And FTC had the discretion, if it chose to, to say, okay, you've alerted us to this problem. We're not willing to issue a mandatory rule based on a 2007 Zogby poll, but we're going to do some more fact-finding ourselves. But they acted well within their discretion in saying, we are not going to commit our resources to doing that additional research here. We think that there are bigger problems of consumer deception. And also, although there may be some egregious egg-labeling practices here, FTC has the ability to proceed case-by-case rather than coming up with a one-size-fits-all rule for the entire industry. And they said as much in their explanation. I'm not sure the FDA did. But with respect to AMS, it looks like the AMS gave a reason. I don't know. If the claimants had not indicated in their petition that they were seeking mandatory labeling regulations for all eggs, I guess my question is, is there another reason that the AMS could not consider adopting the plaintiff's proposed regulations as part of one of their voluntary programs? They would have the discretion, I believe, to adopt the rule as a voluntary rule as part of their programs. But, again, the plaintiffs in their presentation, in this case, both to AMS and the district court, said mere voluntary labeling standards, whether private or governmental, are not sufficient to address our concerns. So, again, the agency is entitled to take the plaintiffs at their word and to deal with the proposal before them. FDA also pointed out, like FTC, that they can take enforcement action against misbranded food on a case-by-case basis. And they gave several examples of instances where FDA has taken affirmative enforcement practice against misbranded foods. So FDA was very clear in its decision that it has the authority to go after affirmative misrepresentations. And page 8276 of FDA's decision, Your Honor. Page 8276, I was about to ask you that one. The first sentence is, as a matter of law, FDA cannot require the labeling of shell eggs to include production methods under 21 U.S.C. Section 321, and the production method is not a material fact. And that doesn't say, and you told me that actually you could, on the basis of the perception, perhaps have issued an overall labeling requirement. It just didn't choose to. But I don't understand. So where do you think it makes this distinction? The next paragraph down, it says, additional labeling requirements are not necessary for FDA enforcement. And if information on an egg label is false or misleading, as you assert some current labels are, FDA may bring an enforcement action under the misbranding provisions. But it seems to say it could issue a regulation. Well, it says it cannot require the labeling of shell eggs to include production methods. And in context, that means a mandated, so I'm drawing a distinction here between a mandatory disclosure rule that applies to everyone and an if-then rule that says if you say animal friendly, then you must say whether you live in the cage. And FDA has rules of both types. FDA says if you want to say low-fat, then you need to comply with these requirements. As a matter of law, FDA cannot require the labeling of shell eggs to include production methods, period. It doesn't say for everybody. It just says we can't do it. We can't require the labeling of shell eggs. And you're saying that's wrong. It could if it conditioned it on misrepresentations. I believe that's right, Your Honor. And the next paragraph says, essentially, the only thing we can do about this misrepresentations is have individual enforcement actions. And that's not true. It could have regulation. But that's not what the plaintiffs proposed here. They proposed a mandatory disclosure rule. And I think our discussion here highlights a different alternative that FDA could have taken up sua sponte if it wanted to. But it would violate the Administrative Procedure Act to require FDA to come up with hypothetical alternatives and then dispose of them. All the APA requires is a reasoned explanation in response to the idea that was actually put to the agency. I'm over my time. Thank you very much. Thank you. We would ask that the judgment be affirmed. Your Honor, in my rebuttal, I want to start with what might be characterized as the 8,000-pound gorilla in the support room or 8,000-pound egg, so to speak. Why does any labeling company call its eggs humane or animal friendly? At no point do we find in the FDA, the FTC, even AMS or FSIS's responses in answer to that question. Counsel for the government suggests that because we, the petitioners, proposed mandatory disclosures, that somehow that necessitates falling only into the material misleading omission definition of misleading under 321N. Couldn't be further from the truth. Let's start with what the statute prohibits, false or misleading in any particular. False isn't even subject to that definition. I would argue animal friendly when it comes from a source like a battery cage, just as the California legislature and populace have determined, is not animal friendly, is not humane, as Proposition 2 underscores. I would also argue that there is nothing in the law that says a remedy for mandatory disclosure necessitates that it is only directed to misleading omissions. Here, it might be pointed out that what the mandatory regulations that were being proposed do is avoid what you might call a whack-a-mole situation where each of these statements, animal friendly, humane, can continuously be used by the sources for egg production to mislead the public depending on how they change the language. By having a mandatory disclosure, you take care of that problem in the first instance. And by the way, under the FDA's regulatory authority, what it says is the secretary is supposed to propose for the efficient enforcement of the act. Nothing is more efficient than giving a simple, elegant source information that completely belies what might be called a puffery or false representations. You cannot have an egg from a battery farm that's humane. And that's what the public wants. They want to see did this egg originate at a battery farm. I agree with you about some pieces. Or that we agreed that they hadn't, in fact, dealt at all with material misrepresentation, even to the degree of saying what they're now saying here. But what about what the district court actually held? And this is back to the beginning again. I.e., that in the end, they said even if all of this wasn't finished, we have other things we have to do. And I looked at it in Massachusetts for an EP, and I do think that the shout was critical there in the end. So the question is, do you have an argument about why, assuming the whole rest of this letter of opinion was, in some sense, not a sufficiently hard look at the question, how does that affect the last piece? Thank you, Your Honor. I seem out of time, but can I answer that? The answer is because the Food and Drug and Cosmetic Act specifically says all misbranded labels are prohibited into the introduction into Congress. Then the act goes on to define what is misbranded. And then the act says the secretary has the obligation to prepare regulations for deficient enforcement. Why the mistake in Massachusetts, the EPA, notwithstanding the shout language, I understand the importance of it, but the judgment language in that same statutory grant was equally important. And also perhaps in the Herdman case. But what Massachusetts versus EPA ultimately said was, yes, they have the authority to. We're not saying about timing or order or stuff, but they do have to do it. Now, here we have nothing that says they have to do it. I would argue that the prescription of the introduction of misbranded items altogether into Congress is such a shout. It's a different form of a mandatory, you must prevent this from happening. And, in fact, the Ninth Circuit itself has recognized that the original FDCA Act, which was enacted approximately 1910, it's over 100 years old, labeling was one of the major concerns in that Congress. But I do want to answer directly the question you asked. Why isn't it sufficient for them, the FDA, to say we want to prioritize other issues? What Massachusetts, the EPA, fortunately pointed out is you can only say that if you are saying that with an understanding of your mandate itself. Here, if the FDA says we cannot, as you have correctly said multiple times, the language under 321N cannot regulate the source of where production occurs. And then says we would, with that background, we would highlight that we would prioritize other matters. It is not a hard look for the simple reason that you are avoiding the fact that your own organic act mandates you to use your discretion every bit as much as those other acts they say they must prioritize. You can only say you would prioritize those other acts over mandatory labeling if you understood your own acts. All right. I want to thank you both very much for a very just and very curious advice. Thank you. Compassion over killing versus U.S. and U.S. administration. Submit and we are in recess. Thank you.
judges: Hawkins, Berzon, Murguia